23-5308 Center for Biological Diversity et al. Appellants v. United States Department of the Interior et al. Mr. Tisdall for the appellants, Mr. Hellinan for the defendants appellees, Mr. Morota for the intervenors appellees. Morning Mr. Tisdall. Morning and may it please the court, my name is Kyle Tisdall representing the appellants, the Center for Biological Diversity, Citizens Caring for the Future, New Mexico, Interfaith, Power and Light, and Wild Earth Guardians. I'm joined by my co-counsel Morgan O'Grady and Jason Rylander at table. There's two points that I'd like to make today. First is that conservation groups have plausibly alleged concrete injuries that arise from BLM's drilling permit approvals. Second, conservation groups have also plausibly alleged that these injuries are proximate to the challenged drilling permits. Before I address these points, I believe some orientation around the nature of this case would be beneficial. This appeal is about whether individuals and members who live, work, and recreate in landscapes that have been overrun by ongoing oil and gas development have adequately alleged standing to challenge thousands of new drilling permits, which add to and compound the daily harms that they endure. The short answer is yes. This case challenges BLM's approval of over 4,000 new drilling permits in two of the country's largest oil and gas producing regions, New Mexico's Permian Basin and Wyoming's Powder River Basin. It is important to note that the permits within these basins are not functionally viewed as separate or isolated by industry or by the agency. Drilling permits are batched together, targeting specific formations within an industrialized matrix of new and existing wells, well pads, roads, gathering systems, compressor stations, pipelines, and processing facilities. Here, BLM's consideration and decision-making for the challenge drilling permits involve generic cut-and-paste analysis, which are processed in gross on the average of 10 per day. And of particular note, this appeal arises at the pleading stage and is before this court on a motion to dismiss, a point where general factual allegations of injury suffice. So, how is your theory of standing that focuses on the aggregation of all of these 4,000 plus permits? How is that theory of standing consistent with cases like Murphy and other cases that have said that we don't dispense standing in gross? Because each of these permits is a separate agency action, an approval of a particular oil or gas well. And the theory of standing here is we can just take all of these agency actions together to create, to think about an aggregate injury or harm. How is that consistent with our case law? Yes, Your Honor. What I would say is that in this case, we're not sort of challenging any oil and gas drilling permit at large in these basins. The complaint alleges and enumerates each specific application for a permit to drill that was approved by the agency. Places then use maps to identify where those permits exist within the landscapes. Let me just ask, as a formal matter, you're not disputing that you need to establish standing with respect to every action that you're challenging. Correct. And the actions that you're challenging are the permits to drill. Correct. And so, in the district court, you argued that you didn't have to show harm for every individual well. But I take it you mean that there may be common proof of harm that applies to numbers of wells, but not that you actually don't have to prove harm with respect to each of the actions that you're challenging. I'd like to tell Alice to answer my question. Well, I just wanted to clarify what the ground rules are because it seems like you're talking past what we're asking. And I just want to make sure that if that's understood, that you will speak within that framework. Your Honor, I believe that the district court in its decision sort of misstated our representation of what we were challenging. I also read your brief. Okay. So, we are challenging each individual enumerator to application for permit to drill. We agree that standing needs to be demonstrated for each of those challenged final agency actions. But you specifically rejected that approach in the district court. That was not your theory of standing. That was argued to the district court. I don't believe that there's a conflict in what we argued at the district court and what we argued at the court of appeals. And on this point, let me just say, federal defendants admit, and I'm quoting from their response brief, quote, of course, plaintiffs can rely on common allegations or evidence to establish standing to challenge multiple agency actions. And the showings plaintiffs make to challenge similarly situated permit approvals may overlap to a significant degree or even entirely. So, what we are alleging is, yes, we, of course, have to establish standing for each final agency action. But courts in this court doesn't view those in isolation relative to the geographic proximity of the harm that is being alleged by the, in this instance, both in our complaint as well as the specific allegations of harms described by the clearance in this case. Let me see if I can get at, maybe it's the same question that Judge Rowe asked, but maybe it's different. To prevail, we have to believe that each of the 4,000 permit applications injures at least one of your plaintiffs to a sufficient degree to establish standing, or do we have to, or is it your argument that even if there's one permit where the injury isn't really sufficient to establish standing, when you add all 4,000 together, then the injury is sufficient? Because that's your theory, right? It's not that any one injures, it's that all 4,000 do because of the cumulative effect of the 4,000. So, Your Honor, I would say each individual well that is approved undoubtedly results in air pollution emissions, impacts to the landscape, impacts within the vicinity of that well. We are also alleging that all of these permits put together do add to the cumulative impacts that are being endured by the declarants and plaintiffs in this case. That's for your NEPA claim, right? Correct. But if we disagree that that's how that works, then you might have standing for some of your other claims, but not the NEPA. Well, let me sort of take a step back. So, I don't think any dispute that injury is tied to the geographic proximity of the challenged agency action. And proximity, I think, is contextual, right? So, and it's contextual based on the injury being alleged by the declarants in this case for associational standing. For example, if the injury is due to ground disturbance from a drilling rig, then the viewshed would be the relevant area to establish that geographic proximity. Whereas if the injury being alleged is from air pollution or ozone, then it would more broadly include the proximity of within that airshed. I think that is consistent with what this court has found in other cases and what other courts have found as well. So, this is not dissimilar from and quite almost directly on point with what the Tenth Circuit has found in two different cases dealing with Dine Citizens Against Ruining Our Environment. And in that case, they found explicitly that plaintiff's ability to demonstrate standing where they challenged hundreds of BLM drilling permit approvals across the broader San Juan Basin of Northwest New Mexico. Again, those circumstances are nearly identical to the circumstances that we have here. I would also allege not only is that case factually very similar, the arguments being made by defendants in that case relative to standing are precisely the same arguments that we're seeing here. And the Tenth Circuit explicitly rejected those providing, I quote, neither our court nor the Supreme Court has ever required an environmental plaintiff to show that it has traversed each bit of land that will be affected by the challenged agency action. In the Tenth Circuit case, wasn't there a single environmental impact statement? And so, wasn't there a single EIS? There was not. I was actually counsel on that case as well, so I'm quite familiar with the record of that case. That was a challenge to individual applications for permit to drill as here. I understand it was a challenge to those individual ones, but wasn't there a single environmental impact statement? There was not. There was individual environmental assessments for those applications for permit to drill. Those permits teared back to an environmental impact statement for the resource management plan, but the challenge was to each individual environmental assessment, not a challenge to the EIS. So, I have a question about that. That's similar here. There are environmental assessments in the individual actions on the applications for permission to drill, but they incorporate the underlying EIS here as well. In Wyoming, that's all they do, and in New Mexico, they get into more depth of breaking out numbers that they've drawn, emissions numbers and stuff that they've drawn from the underlying EIS. So, in terms of relief that you're seeking, would it be inadequacy of the underlying EIS? It would not, and again, I don't want to conflate the merits with the standing arguments here, but... It goes to addressability? It goes to... So, the agency can, on the individual applications for permit to drill, the oil and gas decision process is sort of a tiered process. It starts with a resource management plan. It then goes to an oil and gas leasing stage, and then the application for permit to drill, which is the stage that we're at now. So, the challenge is to the APDs, and the relief could be either denial of the APD or conditioning of the APD that would, for example, reduce the impacts to climate imperiled species, that would reduce impacts to people who live and recreate. But wouldn't that go back to, I mean, what their... As you said in your opening remarks, they batch this. Correct. Both BLM and the industry, they treat these in a more collective way. And so, I thought that your answer would be yes. If you're going to invalidate the analysis in an APD, then, I mean, that's dependent on an analysis in the EIS. So, the EIS would have to be part of the remedy. Otherwise, you've got no remedy, right? And there would have to be consultation. I mean, are you denying that BLM can do countywide, rely on its own regions in determining effects on air quality? I would assume that that's... No, that's up to them. So, that would affect what in going after an APD where you're going after, no? Each stage of the agency's oil and gas decision-making includes a final agency action that can be challenged. In this case, for example, the Carlsbad Resource Management Plan, I believe the most recent resource management plan is from 1986, I believe. So, there is not even a mention of climate change within that resource management plan. There's also final agency actions at the leasing stage, which will include additional analysis. And then, again, NEPA analysis that occurs at the APD stage. Can you challenge it? I thought we had the precedent that you actually can't challenge EIS until there's action, final agency action, relying on it. So, if you wanted to do a wholesale challenge, then, even though that's an action in the colloquial sense, you wouldn't necessarily be able to challenge it. I thought that was why you were challenging the APDs, but I don't understand how the EIS could not be part of your relief. I don't think it necessarily needs to be part of the relief, I think is the point that I'm trying to make. I think each environmental assessment, and again, this will be at the merit stage, but each environmental assessment will include its own level of analysis that, quite frankly, oftentimes needs to fill the gap of analysis that was contained in the earlier EIS. That's why you're both playing the same game. They're saying, we get to batch, you have to do it individually, show your standing. And you're saying, no, no, we get to batch in showing our standing, but they have to individually do separate environmental assessments in localized, well-specific detail. I'm not sure that either of you can have it both ways. Well, I think our argument is that the agency's NEPA analysis, and again, this is at the merit stage, is wholly insufficient for the merits claims that we're bringing. Their climate analysis- We wouldn't object if they respond, if you won on the merits, and they responded by saying, okay, we're going to redo our region-wide EIS, and then we're going to do the same kind of tiering back to it that we did here, only the values are going to be much more accurate and up-to-date. How the agency would want to address that as relief that would be granted, we would agree and concede that it would be far more efficient for the agency. They could redo their resource management plan analysis through an amendment. They could prepare programmatic analysis. In Judge Contreras' work at the District of D.C., we brought a challenge challenging almost 400 oil and gas leases across 480,000 acres in three Western states. The relief that Judge Contreras found in that case was that the agency had not sufficiently analyzed cumulative impacts of greenhouse gas emissions. The agency's remedy is they prepared a specialist report on greenhouse gas emissions that they then, at least under the current administration, all of their oil and gas decisions include that type of analysis in their decision-making process. That was not contemplated by the agency for these drilling permit approvals. That was not included by the agency in these drilling permit approvals. The agency can come into compliance with the law in any number of ways, but the point is that both individually and cumulatively, all of these wells, which they process really quickly, create individually and cumulatively a magnitude of impacts and harm that are impacting the people that live in these landscapes, that create within these landscapes. What is the logical stopping point of your argument with respect to cumulative impacts? Here, there's a suit against all of these oil and gas wells. Could you also just add in logging or other agency actions that are approved on federal lands? Is there any stopping point? There are lots of activities that may have environmental impacts. Do plaintiffs have standing to kind of batch and bundle any combination of these things? How does that work? I think the relevant inquiry for injury is the plaintiffs need to establish injury, and they need to establish that there's a geographic proximity of their harm to the challenged agency actions. It could be any agency actions. Some of the theories seem to also rely on the fact that there have been past agency actions that have approved other oil and gas wells. It's not bound by time. It can be past agency actions, future agency actions, unrelated agency actions, and for all of that, you can claim an injury if a plaintiff lives near that area? I believe it would be cabined by what is being challenged in the context of that case. In Diné Citizens, it was 377 applications for permit to drill within the San Juan Basin that were approved within a temporal limit. Here, the challenge is to 4,000 different applications for permit to drill that were approved during the first 20 months of the Biden administration. What's your theory of standing? What is the limiting principle on your theory of standing, which I still don't understand is how it's consistent with cases like Murphy and other cases about standing? Judge Ra, your decision in International Dark Skies, for example, found standing and found injury to stargazers and astronomers' use of the sky from over 7,500 individual satellites. That is analogous, I think, to the situation that we're dealing with here, only on a far more conscribed landscape than the entirety of the sky, right? It is each individual well is going to cause harm. Collectively, those wells together cause cumulative impacts, and those cumulative impacts are injuring people that live and recreate within these sites. So there's no limit? The limitation would be the plaintiff's ability to demonstrate injury and proximity of that harm. Physical proximity, again, contextually based on the injury that they are describing. So are you saying, I mean, I'd take you to be saying that where the injury might be seismic, you would want to know how far that effect is, the radius of that effect from a well. If it's sightline, you would want to know from the well of the sightlines, which may vary depending on the local topography. If it's emissions, you would want to know how far those emissions, particular matter, let's say, is likely to be felt. That's correct. So it's not just some kind of generic geographic proximity. I have a question about your use of the construct APD area. And I understand that, at least in some of the declarations, they're just going to refer to the area in which these wells are as an APD area. And your friends on the other side challenge that as somewhat random. And I have to say, it strikes me as a little bit confusing as well, in the sense that if you decided that you wanted to draw something, an APD area that encompassed both the New Mexico drilling and the Wyoming drilling, and you only had a couple of your New Mexico plaintiffs, and you say, well, we're in the APD area, would that support standing to challenge the drilling in Wyoming? No, I don't believe it would, which is why we had declarants from both that lived and recreated within New Mexico and declarants that lived and recreated within Wyoming. The APD area, I would agree, it's sort of a colloquial construction, a way to describe the area. But if you look at the declarations themselves, they describe in very specific detail the roads they travel on, where they live, proximity of wells to their homes. They describe hiking trails that they go on, impacts from air pollution. I mean, let's say I take that, I think that has to be right. But let's say there's a well in New Mexico that's 50 miles northwest of Roswell, so far from the cluster of the other wells. I would assume that for the same reasons, you would say, well, that's not within the APD area in the narrow way that you've defined it. But how do we know which are in and which are out? Well, I think here, that's why we do use the maps. And in Denae Citizens Against Ruining Our Environments, there were maps that were also created for the APDs within that landscape. And so I would agree, if a well is far outlying, 50 miles away, unless there is a declarant that says, like, I use and I am in proximity to this specific well, then you wouldn't be able to establish standing for a well that was far outside the region. In this case, the declarants, again, are talking about their travel within a landscape, living within the landscape, recreating within a landscape, and very specific harms that come from these wells. And in my opening remarks, I sort of talked about, like, these wells aren't considered and aren't viewed in isolation. Like the Permian Basin, for example, is the largest oil and gas producing basin in the country. There is a lot of existing wells. For example, Marcello's Shale, huge. There are geological formations that are very far flung, and it's not necessarily correlating with the injuries, in fact, of people who live above. And I didn't take you to be advancing that theory about the geologic formation. I guess my question is really, the unit that BLM uses is the region which tracks onto county, and that's where they measure air quality. And so why APD? Why not region, county? Well, again, I think the way BLM conceptualizes these things in their approval process, they're using sort of cut and paste analysis for an entire sort of local field office. In this case, for the Permian Basin, that would be the Carlsbad Field Office. So the analysis coming out of that Carlsbad and Roswell in New Mexico and the Buffalo Field Office in Wyoming, the analysis coming out of those field offices are, again, like very similar to one another. You cannot process APDs at the pace that they're processing them by doing new analysis for every APD that comes in. And again, over the course of this 20 months... And what they're relying on is, I take it, and they can correct us if we're wrong, a county-based, a region-based EIS. Well, their EIS in the resource management plan is the field office. So in this instance, in the Permian Basin, that would be Lee and Eddy counties. And I believe in Lee and Eddy counties. That is the heart of the Permian Basin. So they're not doing unique new analysis for each APD, correct? And that analysis at the APD stage will peer to prior analyses that the agency has done. The merits claims in this case are that the agency has failed to sufficiently take a hard look at the climate impacts of its decision-making, that under the Federal Land Policy and Management Act, it's fair to account for its obligation to consider and take action to avoid unnecessary and undue degradation. And then under the Endangered Species Act, we're arguing that the agency has failed to consult with the Fish and Wildlife Service over climate imperiled species. But that is distinctive from the harms that Clarence and plaintiffs describe relative to their impacts that they experience and endure from this magnitude of new wells going into this landscape. Except with respect to the species injuries, you cite polar bears, species around the globe, and that... So the species are... I'm sorry, finish your question. It seems like that's in conflict with CBD versus Department of Interior, 2009 case of this circuit, that injuries that are mediated by global effects of climate change are too generalized to support individual standing. And it just wasn't clear to me how you could have standing for your ESA claim and view of that precedent. So the Center for Biological Diversity Interior, I think is distinctive in that it contemplates two different theories of standing. One is a substantive theory of standing. One is a procedural theory of standing. I would note that all of the species that were noticed in this case are not around the globe. They're all found within the United States. And in CBD versus Interior, standing was found for the procedural injuries. And quote, affidavits demonstrate a sufficiently immediate and definite interest in the enjoyment of animals. The Supreme Court has recognized that it is a desire to observe species, even for purely aesthetic purposes, is undeniably a cognizable interest. So I think it's... And again, there's five different declarants that speak to their interest in viewing these climate-imperiled species within their habitats. That would include the whooping crane whose wintering grounds in the Gulf Coast are going to disappear within a matter of years. So it is the injury to the individual that likes to observe that species. Now, climate change is the driver of that harm to those species. But as in growth energy, this court found there were diffuse impacts from farmers in the Midwest for their biofuels production that was funneled through an agency action. And the harm to the species was in the Gulf Coast, where those species were impacted by downstream of those biofuels almost a thousand miles. So the standing for our ESA claims is our declarant's interest in observing those species. And climate change is a clear driver of why those species are listed. I think that one of the challenges that maybe is presented is that we look at standing as an Article III jurisdictional issue. So we deal with it at the outset. And as you indicate, we of course have to, for the purpose of that, presume that your merits arguments will be successful. But I think what's a little tricky here is, does that mean that we also have to presume that you've led the proper unit of prosecution, so to speak, the proper claim? I mean, normally you don't get to rule nine and join their issues until later after you address standing. But what if this unit of prosecution just doesn't work? And we think that it's too broad. It needs to be segregated or tabbed into three or four pieces or something of that nature. So shouldn't we figure that out at this point rather than just kind of ignore that as an issue? Well, I think, Your Honor, you bring up a good point, which we are before this court at the pleading stage where general factual allegations of injury do suffice. And that is a clear threshold at the pleading stage. And our, I think, briefing and arguments clearly support that we have far exceeded that threshold to support our general factual allegations at this stage. The other cases that we were speaking of earlier, Dine Citizens, Wild Earth Guardians, these cases are all at the merit stage, which have a different standard for the demonstration of standing. But I think, Your Honor, your question, and correct me if I'm mistaken or misstating the question, is there is a relationship between standing in harm and the allegations of claims that we're making on the merits. I would say that this is not a case of first impression. We've been prosecuting and bringing these cases in. Let me ask it a different way. Okay. Because I don't think my question was very heartful. So, let's suppose the claim were, we represent, you know, 4,000 people who are employees of Company X and they work in various locations of Company X around the country. And each of them has been teased by their supervisor. We don't believe that kind of like the teasing individually for like one employee would be injury for standing. But if you take the cumulative effect of 4,000 people being teased and the company kind of like not doing anything about it or allowing it to happen, or even having a policy that encourages it, that when you add all of that together, that's a sufficient injury. So, let's suppose that's this hypothetical lawsuit. But what if at the outset we said that we don't think that like all of those claims can be joined in one lawsuit? Wouldn't that factor into whether we thought that there was standing? Or would we just say, well, you've joined them all together. They're standing, at least at this point. We'll let the district court figure out joined or later. And then if that impacts standing, then they'll figure that out at that stage. Well, I would say, I'm out of my depth here a little bit, Your Honor. I don't practice class action law. In that hypothetical, I would assume a class might be created and then standing. This would be similar to transunion, for example. And then the question would be, has that class been able to establish a concrete injury from the teasing? I think in this instance, and in the facts of this case, when we get to the merits arguments, I think it will be a more straightforward inquiry on the merits than the hypothetical that you have. Because it is, this is a record review case, first and foremost. So, the record is defined. And the record is going to be based on the agency's consideration of evidence that was before it when it was making its decisions on the environmental assessments approving the APDs. In this instance, those APDs approvals include sort of boilerplate cut and paste analysis across these field offices. Again, on the average of 10 per day. And if you look at an environmental assessment, they can average you know, anywhere from sort of 100 to several hundred pages typically for an APD level environmental assessment. So, the agency cannot do unique analysis every time it is approving these APDs. And so, there are a common set of facts that we will be dealing with at the merits stage. And that will be sort of our burden to establish that at the merits stage. But I think it's the harm that is endured by plaintiffs for purposes of standing. And the clearance, again, provide tremendous detail and specificity about the types of harms that they experience from living in a landscape overrun by oil and gas development. That, those standing, those harms for standing purposes are distinctive from the record that will be before the court at the merits stage. I believe I'm through my 10 minutes. But if there are any other questions, I did think I reserved two minutes for rebuttal. Okay. We'll give you some time on rebuttal. Okay. Thank you. Thank you. Good morning, Mr. Halinan. Halinan. Halinan. Halinan. Halinan. Thank you. Good afternoon, Your Honors. And may it please the court, Daniel Halinan for the United States. We believe the district court correctly dismissed this action because plaintiffs cannot rely on aggregated allegations of harm to challenge thousands of agency actions. It would help if you would speak up just a little bit. It may be maximum height. Sorry. Okay. I'll speak up. So, Congress provided for leasing of oil and gas resources onto federal land generally and charged the Bureau of Land Management with making individualized determinations by reviewing and considering applications for permits to drill. Plaintiff's lawsuit in this case is seeking broad relief from oil and gas development in New Mexico and Wyoming generally. But under the APA, that type of claim can proceed, if at all, only as a challenge to these 4,019 agency actions as I think we've discussed today. But the problem that we see in this case is that plaintiffs haven't established a sufficient level of standing to challenge each of those 4,019 permits. That's a new one. A sufficient level of standing? They haven't established standing. I apologize. They haven't surely established standing with respect to some of the permits to drill. I think our view is that the types of injuries that they've had alleged would likely be sufficient to support challenges to some of the APDs. But because of the way they've structured the lawsuit, we simply have no way to tell. Because of this sort of circle drawing technique where all of the allegations of injury are aggregated together and not associated to particular drilling permits. On the informational injury, on the ESA claim, they're saying the absence of a biological opinion, it's a document that's meant to be made public. Why doesn't an individual deprived of a biological opinion have an informational injury sufficient to support standing and why doesn't our precedent so establish? So I think as part of the two-pronged test for informational standing, the plaintiff has to have a right under the statute to disclosure. Something like the Freedom of Information Act, of course, provides that sort of right to information. But Section 7 doesn't speak to plaintiff's rights at all. It doesn't speak to third-party disclosures in any way. Section 7 is a statute that governs consultation between agencies that does, of course, produce biological opinions that plaintiffs allege that they look at. But there's not a right alleged that they look at and use. And have an entitlement to access. I think if they were to, for example, request a biological opinion under the Freedom of Information Act, that's, you know, the U.S. Fish and Wildlife Service versus Sierra Club case from the Supreme Court. There's a right under the Freedom of Information Act, but that's not what the claim is here. They're claiming informational right under Section 7 itself. There's no FOIA issue here. If they were to re-plead that and add a FOIA assertion, then they would have standing? No, I don't think so. If they were to file a FOIA request and it was denied, they could add a claim and they would have standing to contest that. So I'm just using it as a comparison. There's no Section 7 right to information because Section 7 isn't a disclosure statute. Isn't it about information forcing for better public decision-making, including decision-making with public participation? I thought that was one of the functions. So Section 7 is about, you know, the consultation, the Fish and Wildlife Service and the National Marine Fisheries Service, you know, providing their expert, you know, review of the Endangered Species Act issues to the action agencies. But it is not a public disclosure statute per se because there's no language in the statute that requires the agency to disclose to a particular plaintiff, which is why I invoked FOIA because that's a separate type of statute and that's the way that they could, you know, request information. But that's not the claim at issue here, the type of standing that they're asserting. Your position is that had they sought or if they, moving forward, sought information under FOIA from BLM and it was unavailable because it didn't exist, that that would tee up their standing to raise an informational injury? No, I don't think so, Your Honor. I apologize if I'm not being clear. I think if there was a FOIA request, that would be standing only to pursue a FOIA claim, not to pursue the claim here. I'm just using FOIA as a contrast with the Section 7 statute because Section 7 doesn't have any disclosure language in it itself. And that's what I think the informational standing cases require. If they're claiming a right to bring a Section 7 claim, an ESA claim, based off of disclosure, there's no right to disclosure in Section 7 itself. How does the Supreme Court's decision in Alliance for Hippocratic Medicine affect the circuit's informational standing cases? So I have a couple of responses there. I think, first of all, I think it's a clear direction not to expand Haven's royalty beyond essentially the scope of where it is already. I think it is possible to read Alliance as creating tension in some of the cases like PETA and antivirus section, but I don't think the court needs to reach that issue in this case because we think that even under those cases, plaintiffs don't have standing. So there's sort of any tension or conflict is not directly implicated by this case. But the Supreme Court's decision certainly suggests we can't read our precedents broadly. I agree with that. At a minimum. Yes, I agree with that. And so I think applying PETA or antivirus section more broadly than the contours of those cases itself in the way that I think plaintiffs are asking the court to here, I think that would be inconsistent with the direction of FDA versus Alliance for Hippocratic Medicine. So I think just moving on to this question of sort of their theory of standing and aggregate standing and why we think it's inconsistent with the idea of the prohibition on standing and gross is that I think there's a mismatch between the type of case they're seeking to bring and the nature of the standing submissions that they've made. Because looking at the First Amendment complaint, the action here is clearly about challenging oil and gas generally, development generally. And so the standing declarations are modeled to support that type of claim. But again, that's not sufficient when we're talking about challenges to 4,000 agency actions. But you don't dispute that in general plaintiffs can obtain standing by showing concrete injuries to them, where they live, the work they recreate in geographical proximity to permitted drilling, right? The question is whether they've made that kind of showing with respect to all of the drill permits involved in this case. Yes. And what about the reality that BLM does, for example, air quality assessments for every well that's permitted within the particular, what are they, the Bureau's remit that they do it on the county basis? Right. That's the data that the agency itself uses. Yes. So I think the merits issues and challenges to all these APDs, not all of them, but in groups of APDs would be very similar because the issues in the government's environmental analysis will be similar across similarly situated permits. But I think that's a separate question from the question of whether they have sufficiently alleged injury or established injury from these different permits. Even if the merits issues are the same, they nonetheless need to identify an injury that's concrete and particularized and traceable to each of these. Yeah. And do you disagree with Mr. Tisdale acknowledged today that one way to do that would be if they could establish that a well, the activities at a well would affect air quality, let's say within 20 mile radius, that as long as they had allegations that they were living or working or recreating or using the air within that 20 mile radius that they would have shown standing with respect to that well? Yes. I think allegations of local pollution from a particular well or other types of effects from oil and gas development can support standing if they're presented in a cognizable way. But we simply have no way of telling in this case, whether for any particular APD that they're challenging, whether they've made that allegation because they haven't tied any of their standing submissions to any particular permits. And I don't think we're asking for them to do anything to owners. Like we've said, and as Mr. Tisdale quoted from our brief, we agree that common proof can apply to multiple permits. You can rely on a geographic nexus. I think when you look at their own submissions in the clouser declaration, where they put together these maps, they themselves have drawn narrower groups. I think it's something like 600 of what they call unique sections where they put these APDs together. If they could allege that that unique section, as they call it, has effects on a local area that one of their declarants experiences, that is the type of thing that can support a claim. But putting aside the APDs, if the action were a challenge to the EIS, would an EIS is evaluating the effects of all of the drill permits within the, I think it's within the county in one EIS. And if the plaintiff were harmed within that EIS, presumably that plaintiff would have standing under Legion case law to challenge that EIS. Yeah. So an EIS that covers a broader region, as long as you have an injury that's traceable to that EIS within the region, I don't think there's a difficulty in challenging an EIS. There might be other standing problems at the EIS stage because it's the first of three stages, the leasing stage. Correct. The leasing stage, that would be a sort of narrower scope. That might be the type of thing where they can say this lease sale affects this particular community where our declarant lives. But that's simply not the case that we have before us because they have chosen this sort of all or nothing approach where they want to be able to challenge all of them and have declined the opportunity to tie any of their allegations to particular permits. Can I clarify something? So in their brief, opening brief, there are two maps. One says, is labeled, these are all the maps showing all of the New Mexico applications for permits to drill. And then a few pages later, they have a map that says Wyoming applications for permits to drill. Is it correct that within those two maps depict the location of all 4,019 APDs that are at issue in this lawsuit? So this is a map that they prepared. So we've taken it as true because we're at the pleading stage. So if we take that as true, then on these two pages, we can see where all of the wells are essentially, right? And if the declarations describe in relation to these maps where people live, recreate, drive, hike, whatever it is, and they have at least one plaintiff who does any of those things within, I think the Diné citizens case used the 20-mile radius. So if they have at least one plaintiff that does any of those things within 20 miles of everything that's on one or both of those maps, then why haven't they established a scheme? So I think the issue is that we don't know whether they do have those types of plaintiffs or declarants because of the way they structure their declarations and their submissions. So for example, they talk about, you know, using visiting Carlsbad Caverns, hiking on a particular trail. If, you know, you have a declarant hiking on a trail and alleging an aesthetic injury from the view shed, you know, I'm hiking the trail, I see oil and gas development, that's an aesthetic harm. I think that could support standing to challenge those drilling permits, but they haven't told us which ones support what challenges. And they've insisted instead that they have the ability to rely on, you know, challenges that might support some APDs to challenge all of the APDs. And it's their burden to make that connection. And so that's why we think it was appropriate for the district court to sort of decline to do their work for them and dismiss the entire action. So just so that I'm clear, at the motion to dismiss stage, you believe that our precedent and the Supreme Court's precedent, Lujan, et cetera, requires declarations as opposed to just allegations or how does that? I think allegations are sufficient at a Rule 12 stage. But if you look at the allegations in the pleading itself, they're nowhere near as detailed as the declarations, which is why I think the briefing is centered on the information in the declarations. And so you think that the district court was not permitted to, and we are not permitted to rely on the declarations because to do so would convert it into a summary judgment motion. Oh, I apologize. Ask us to do that or I'm just trying to understand how we're operating. I apologize, Your Honor. I think it's permissible at the Rule 12 stage to look at the standing declarations to support standing. They've offered them to supplement the pleading to establish their standing at this stage. So I think it's perfectly fine to rely on them. Standing declarations, we just don't think they're sufficiently detailed in connecting the injuries to any particular permit approval. They say, you know, we have injuries of this kind, this kind, this kind. They might line up to APD 1, 2, or 3, but we just don't know which one. And so I think that's important because if they were to file independent lawsuits challenging APD 1, APD 2, and APD 3, if they don't have standing to bring that lawsuit challenging APD 2, they can't bring it in a lawsuit combined with APD 1 because they have to have standing for each of those APDs. And there's no way for us to look on the record that they've submitted to see whether they have that kind of standing to bring each of these challenges that they're seeking to bring. And again, we don't dispute that this is the type of evidence that can support a challenge, but they've chosen to pursue this sort of all or nothing approach where they want to be to challenge all of them or, you know, have declined the opportunity to present more particularized search warrants. Can you clarify, does the government dispute the conservation group's theory of standing as well as, I mean, there's some of the comments that you've made in oral arguments suggest that you think their theory may work. They just have failed to demonstrate standing under that theory. And there are other times I'm hearing you to say that the government's theory is inconsistent. I mean, the conservation group's theory is inconsistent with our standing precedent. So if you could just clarify the government's position for me. Yes. So I think the theory of standing that relies on aggregating harms is inconsistent with the court's standing. What is permissible is to use a geographic nexus to tie multiple APDs to particular allegations of harm and say, you know, this group of APDs in the same area has harmed us in a concrete and particularized way. How is that different from an aggregate theory if it's a group? Because you also said if there were three APDs and, you know, one of them there was no standing for, you couldn't get standing by grouping the three together. So how is that consistent with the geographic nexus understanding of standing? Because I don't think they've demonstrated geographic nexus to all of these APDs in a sufficient way for us to be able to identify whether... So a geographic nexus would still require standing as to each individual APD within the geographical area. Correct. And the idea is just... A way to show it with respect to each... Correct. You could use common proof to show that, you know, you have several APDs clustered together. They collectively, you know, create an aesthetic harm because they're in the recreational trail, something like that. But the problem that we're identifying is aggregating different harms that wouldn't apply to each APD. So, you know, if you have an allegation of harm or, you know, attestation of harm in the declaration that would support one APD, it clearly can't support all 4,000. So the issue is this aggregate theory obscures the issue of the question whether they have actual standing to pursue all 4,000 by just asserting that collectively they do. And we think that is what is inconsistent with the court's precedent. How does cumulative injury, in your view, fit into the picture? Because as I understand your regulations, when assessing in an EIS, for example, assessing harm, the agency takes existing activity as the starting point and considers the addition, the incremental addition from proposed activity. And I guess if there's simultaneously a lot of different proposed actions, that the agency should consider those too? So the agency would, you know, can consider cumulative impacts as part of the need for process. Is it obligated to? It depends on the circumstance, right? And so that's part of the claim here. So I don't want to get ahead of the merits in this case. But I think the fact that the merits question may look at the cumulative impacts is it's fundamentally just separate from the standing question. You can have standing to challenge an APD and look at the cumulative impacts and not have standing to challenge a different APD that might, you know, have similar cumulative impacts issues because you're not affected by the local pollution or whatever it is that supports standing to challenge the second APD. I'm just not entirely sure. Maybe it comes into redress if you say I'm harmed by the APD down my block. Permit has been granted on a will down my block. And I'm clearly within sufficient geographic proximity on all kinds of axes. But the reason why that is harmful to me is because two blocks further away, or a quarter of a mile further away, or 20 miles further away, there are a lot of other wells, just for simplicity's sake, let's say that are already in place. And it's really because that proximate well is going to tip over some tipping point that it harms me. Maybe that's a merits argument about cumulativeness, but it seems to me that it would be fair, in fact, appropriate, maybe even necessary to consider that at the standing stage. I think that's at least sufficiently particularized to the individual APD. Okay, now let's say those 20 wells that are a little bit further away are not yet built, but being built simultaneous with the one close to me. And if the one close to me were taking isolation, maybe it wouldn't harm me. But when it's backed up with all those others, it tips it over the brink. It seems to me that that might also require the consideration of not just the one right near me, but at least for purposes of relief or dress, how those others are interacting with it. Yeah, I think there could be a couple issues with that. There might be a traceability question where the injury is actually caused by the third party independent actor. And it could also be a redress issue because if you were to vacate the APD, it wouldn't actually do anything to address the underlying injury. So I think that could be an appropriate consideration where we have a direct injury that they're alleging is caused by a particular permit. And we're just not at that stage in this case because of the sort of aggregate way that they've brought the case. I'm also way over my time. I'd be happy to answer any further questions. Thank you. We'll hear now from your friend, Mr. Murata. Thank you, Your Honor. And may it please the court, Sean Murata. I represent Chevron USA, and I'm speaking on behalf of all of the interveners, including the state of Wyoming. I want to make three points at the podium today. The first is that we've been discussing standing is not dispensed in gross, and therefore there must be a showing of injury, causation, and redressability as to each of the final agency actions that are at issue here, all 4,000 of them. That matters constitutionally because this court is not in the business of adjudicating programmatic challenges to the way the government does business, only concrete disputes between adverse parties. And that's a principle that ranges from Murphy to back to the 90s and other cases, and even back to the 70s that say generalized disputes with governmental policies are not cognizable in the Article III courts. And it matters practically to interveners because these 4,000 APDs are not all owned by the same company. There are a big joint defense group that sits behind me that if it's not their APD that's causing the harm, then they very much would like to be out of this case, even if perhaps other people's APDs are causing the harm. That's why there's necessity to show that there's a relationship between the harm that is alleged and the particularized APD, because if it's not our APDs, we want out of this case. And in fact, below in the district court, there were individualized defendants who said, look, whatever they've pleaded with respect to other people's APDs, they haven't shown injury from ours. And the response was, well, but it's all 4,000 of them together, so everybody gets held in. So there is- Is that a joinder problem as opposed to a standing issue? I don't think it's a joinder problem because Rule 20 is, is there a common question of law or fact, and the allegation is there's a common question of law with respect to the underlying merits. But it is a standing problem because if I am not the one that's causing this injury and you don't have standing to challenge my APD, that claim should be out of the case. So the problem is not it should be filed in a separate lawsuit, which would be a joinder problem. The problem is the suit shouldn't be brought at all. Mr. Morava, can you speak to the government's geographical nexus understanding of standing? So it seems that the government and the interveners agreed sort of as to the aggregate theory, but do you believe that the conservation groups could get standing under a kind of geographical nexus understanding where there was a group of APDs together? I think if you understand geographical nexus in the right way, Judge Rauh, which is I think the second point I want to make, which was it gets to Judge Pillard's question about when you define the geographic nexus or the affected area, which is sort of the term that's been kicked around in this case, it has to be by reference to some impact or harm that's objective. So if you're claiming harm from particulate matter, well, you have to know how far does the particulate matter go out. If you're claiming it from the view shed, well, you have to know something about the topography and about the sight lines. If you're doing it based on the seismic activity, you have to know something about how far do the shock waves go. So although I'm not typically in the business of telling my opponents how to plead their case, if they had a map and they said each of these wells emits particulate matter for five miles in a circular radius, and I'm this chute and located at the center of all of those overlapping five mile radii that you put on the map, and she can then show that those overlapping, that particulate matter is increasing her risk of harm for health or other interests, then that would be standing. And I think that's what the courts mean when they say geographic nexus. You're within the area of the effect of the harm that you're claiming. That harm is still tied to each individual. It is. Each individual well. And so that's how we understand geographic nexus. Now, I do agree with the government that, of course, there's often common proof. If you have two APDs that are on a well pad directly next to each other, then yes, of course, your standing is going to look pretty much exactly the same for each of them, but it is individualized. Their burden does not get any easier because they filed 4,000 essentially separate lawsuits in one complaint as if they had filed 4,000 separate lawsuits in 4,000 complaints. It's the same burden as to each APD in our view. And in this case, there is no allegation as to how far the radii are. There is no allegation as to how far the particulate matter goes, how far the seismic shock waves go, how far the sight lines are cut off. There's no allegations in these declarations. In terms of the DNA care case, I understand that you don't agree with it. I don't think the district court, as I read it and as I read the papers in this case, I don't think the district court was correct that it's distinguishable because it challenges single agency action and this challenges many. I think the structure of the environmental impact statement and as it individual permits to drill, the facts are the same. I take that. So given that, there's also an argument that our circuit precedent forecloses the approach that the Tenth Circuit took. Do you think that's right and can you explain that? Sure. Let me go a couple of different directions with that, Judge Pillard. One thing we've been talking about today is the EIS and whether you can challenge the EIS. And I will draw this back to DNA Citizens, I promise, is that you can't challenge an EIS in the vacuum because an EIS is not a final agency action under the Administrative Procedure Act. It's that EIS is support final agency actions, be it an APD or something else. But I think, Judge Pillard, to the question of how do you challenge on a more region-wide basis, the way you do this in oil and gas leasing in the Permian Basin in Wyoming is you challenge the lease sale because the lease sale is in a more regionalized basis. And in fact, plaintiffs can and often do challenge the lease sale. Why they've decided to challenge the APDs as opposed to the lease sales, some of which I think there are even some lease sales that are under challenge supporting these APDs, I can't speak to, but there are ways to challenge things on a more regionalized basis, just not the individualized APDs. Bringing it back to DNA, I do think- So arguably premature, there are leases. I mean, I think there are leases that remain dormant for decades. So there are time limits on how quickly you have to produce your lease, but it is true to say that not every lease that is purchased is developed. Absolutely, Judge Pillard. But what we often see in the case law and there has been found to be standing is if you allege an inadequate EIS at the lease sale stage, because it doesn't take into account sufficiently cumulative impacts from the anticipated development, those cases go forward. It's just that because they've challenged further down at the funnel at the APD stage, that they are trying to wedge, I think, a regionalized challenge or a programmatic challenge into challenges to various APDs. To jump back to DNA, I do agree that I think the 10th Circuit in DNA was a little imprecise because it did seem to be thinking about challenging an EIS, which in our view is not something that is done, quite frankly. And so that's part of why we disagree with DNA. I think DNA is also- There are challenges to EIS in connection with final agency action as to- And there they did, as in this case, have final agency action. So it's challenging and in connection with an action as to which is deemed inadequate. And to the extent the 10th Circuit thought that because there is this unified EIS that supports 300 APDs, of which there would not be standing with respect to each one, we think the 10th Circuit is just incorrect on that. I do think DNA is reconcilable on the fact that the 300 APDs there, I think, are more geographically clustered than the APDs here, where you have APDs, of which are clustered, but some of which are far Northwest, way up the highway, even in different regional offices. And to answer your question about how it is different in respect to this circuit's precedent, Judge Pillard, it's that the 10th Circuit in the Lucero case that it was relying on in DNA disagreed with this court's decision on Bank and Florida Audubon, where this court made clear that with procedural injuries, you still have to show the tight connection between a substantive injury and the thing you're complaining about, whereas the 10th Circuit appears to have case law that says that it's a looser standard under NEPA because it's information forcing. I'll also note that in the Rocky Mountain case that the district court cited, the 10th Circuit seems to have narrowed its understanding of DNA because when it was describing DNA, it described the plaintiffs in that case recreating and traveling near each of the 300 APDs. So I think in that respect, perhaps the 10th Circuit has drawn back from some of the broader readings of DNA than the plaintiffs advanced. For all of those reasons, I think DNA doesn't control, and obviously it doesn't control. And I think it's both reconcilable, but ultimately, if it's not reconcilable, we just think it's incorrect. But so I think the key problem here, Judge Pillard, is we are not suggesting that if you had different declarants or maybe the same declarants and different allegations, they could not use some APDs might be subject to challenge. But as my friend from the government said in his brief, they've litigated this case on an all or nothing basis. They have said it's essentially all 4,000 or it's nothing. They didn't say, well, it's all 4,000, but if it's not all 4,000, it's at least these 10, and let me tell you which 10 we're thinking about. They just told the district court it's all of them. What about a case in which there's an EIS and as individual applications for permits to drill are reviewed, the Bureau looks at the EIS and says, oh, the EIS evaluated one well to emit this and this and this and adds a seismic risk, this and this and this. And so we're gonna just say, here's a permit that involves two wells. I'm gonna just multiply those figures by two. Environmental assessment. Next one, seven wells. I'm gonna multiply those figures by seven. Environmental assessment. In that, and you're challenging all the wells that are under the lease sale and that are now permitted, why isn't the standing to challenge those, that group of permits supported by the same token that one would have standing to challenge the underlying EIS? It's the same environmental information. It's the same environmental information, but in procedural cases, and this is, I think, the insight of Florida Audubon is that you're not alleging harm from the fact that the EIS is prepared wrong. What you're alleging harm from is that there is an APD in my backyard that is emitting or blocking my sightline or whatever they are claiming. So there has to be that linkage between the actual concrete effects that create the Article III injury and the fact back to the informational injury that's alleged by NEPA insufficiencies. The EIS is not causing anybody harm. It's just a piece of paper. Oh, yes, it is. Because it's information, which is inadequate, is being used as a ticket to approve an APD. That is a- It's a little bit different from the mechanism where the EIS is being used as the ticket to allow the leasing plan. That's right, but it's the leasing- Maybe countywide or maybe shale wide. I don't know how they- Right, but in that case, the concrete harm is coming from the lease sale, which will then inevitably lead to development. And the Supreme Court has held actually at the RMP stage that it's not maybe a standing problem, but it's a ripeness problem. So that part of the funnel, as you suggest, it may not be ripe because there is not sufficient indication that there's going to be any development. At the lease sale- I don't know which tank is that. I unfortunately do not have it at the tip of my tongue because it's not in the briefs, but- It's easy enough to find. But that is what the Supreme Court has said with respect to the RMP. Right. The leasing, you think there's precedent that says the leasing stage is ripe? There is precedent that lease sale cases can and do go forward because we're further down the funnel, even though understanding that it's not a guarantee there will necessarily be wells developed on each of the leases that are sold. Thank you, Your Honor. Thank you very much. Mr. Tiz, do I have time? All right, you've used all your time and then some, but we'll give you rebuttal. Yeah, I will try to be brief because you've been more than generous with us today in the amount of time you've given. I just want to note, I don't know if my colleagues have ever visited these basins. I was down in the Permian several weeks ago and you literally cannot stand anywhere within these basins and look in 360 degrees and you see nothing but a sea of oil and gas wells and processing facilities and pipelines and roads and trucks. This speaks to the harm that is endured by the people who live within these basins. They cannot go about their daily life without being affected by the haze. Again, this is a region that is in non-attainment for ozone, so the air pollutant emissions are impacting their health. They're driving down roads that are overrun by oil and gas trucks. The federal government has acknowledged that these are the types of injuries that support standing. Is there any reason why you didn't sue to challenge the approval of the lease sale? There are challenges pending in the District of New Mexico, challenge summing some of these leases, but your question earlier sort of hit the point that many of the leases can sit speculatively and undeveloped for decades even. Some might be past the statute of limitations, but the fact of the matter is that there are additional final agency actions approving each of these wells. I think that the tension here in this case is, and there isn't a meaningful distinction between the case that we have here and Diné citizens. In the Tenth Circuit, their evaluation of the maps used in that case, of the declarations used in that case, again, at the merits stage, I would say that the maps and the declarations here actually offer greater specificity than were presented to the Tenth Circuit in that case. The distinction here- Just a point of information that there aren't 4,000 dots on the map, and I take it that that's akin to a pixelation problem, that some of the dots represent multiple wells or even multiple APDs? Some of the APDs themselves include multiple wells, but- That's correct. Sometimes a company or an operator will submit an APD for a single well. Sometimes they will submit an APD for groupings of wells. Are those all, or is there also kind of a pixelation issue where there might be, in one of those tiny little squares, more than one permit to drill? Do you know the answer to that? I don't, and I can check with our GIS specialist. I believe the answer is that what was mapped was the environmental assessments where those were located, but I would not disagree that there's probably a pixelation problem with just an overlapping of multiple wells on the map. What I would note is, you know, the 377 applications for permits to drill at issue in Diné CARE, those permits were approved over the course of several years. Here, the real conflict is in the number, and I think the magnitude of APDs at issue in this case. That speaks to just the pace at which these APDs are being approved in these basins, rather than a deficiency or some meaningful distinction between the sort of geography or the harms being alleged by declarants for purposes of standing. You said it's a contrast. You said that was over several years, and here it's in strong contrast, and what's the contrast? Well, these 4,000 APDs were approved over a 20-month period, so it's the fact that we're challenging so many of these speaks not to us being creative in the construction of the case, but just the absolute gangbuster pace that the agency is going through to approve these wells, and I think the, you know, yes, we could bring these cases individually on individual wells, but that would both overwhelm the court, but it would also prevent plaintiffs from ever bringing a case that really addressed the magnitude of cumulative impacts being endured by people who live, work, and recreate within these areas. All right. Thank you so much. Thank you. Case is submitted.
judges: Pillard; Wilkins; Rao